AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT



LODGED
CLERK, U.S. DISTRICT COURT
**12/2/25**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MRV _____ DEPUTY

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT
**12/2/2025**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ MMC _____ DEPUTY

United States of America

v.

JOSE FRANCISCO JOVEL,

Defendant(s)

Case No.  2:25-mj-07512-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of December 1, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(f)(1) | Attempted Malicious Damage of Federal Property |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ *Briahna Winter*
*Complainant's signature*

Briahna Winter, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:    December 2, 2025

*Judge's signature*

City and state:   Los Angeles, California

Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Jenna W. Long (213-894-8692)

## <u>AFFIDAVIT</u>

I, Briahna Winter, being duly sworn, declare and state as follows:

## I. <u>PURPOSE OF AFFIDAVIT</u>

1.    This affidavit is made in support of a criminal complaint and arrest warrant against Jose Francisco Jovel ("JOVEL") for a violation of 18 U.S.C. § 844(f)(1): Attempted Malicious Damage of Federal Property.

2.    This affidavit is also made in support of a search warrant for a blue Motorola cellular phone ("SUBJECT DEVICE 1"); a black TCL cellular phone ("SUBJECT DEVICE 2"); a green Motorola cellular phone ("SUBJECT DEVICE 3"); a blue cellular phone with an unknown manufacturer ("SUBJECT DEVICE 4"); a black Alcatel cellular phone ("SUBJECT DEVICE 5"); and a white Sky Devices cellular phone ("SUBJECT DEVICE 6") that are in the custody of the Federal Bureau of Investigation ("FBI") in Los Angeles, California and being logged as evidence under case file number 174-LA-4167960 (each a "SUBJECT DEVICE," collectively the "SUBJECT DEVICES") described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 844(f)(1) (Attempted Malicious Damage of Federal Property); 18 U.S.C. § 844(h) (Using or Carrying an Explosive to Commit or During Commission of a Felony); 18 U.S.C. § 844(i) (Malicious Damage or Attempted Malicious Damage of Property used in Interstate or Foreign Commerce); 18 U.S.C. § 922(g)(5) (Possession of a Destructive Device by a Prohibited Person); and

26 U.S.C. § 5861(d),(f) (Possession of an Unregistered Destructive Device or Making a Destructive Device Unlawfully) (the "Subject Offenses").  Attachments A and B are incorporated by reference herein.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. <u>INTRODUCTION</u>

4.    I am a Special Agent with the FBI and have been so employed since October 2023.  I am currently assigned to a Domestic Terrorism and Weapons of Mass Destruction Squad at the Los Angeles Field Office, where I primarily investigate people who commit violent criminal acts in furtherance of their political or social ideology.  I have led and participated in numerous criminal and national security investigations, including those involving the use of dangerous weapons, including fire and explosives in connection with criminal acts, and those that act motivated by ideology.

5.    Upon joining the FBI, I attended and graduated from the FBI's Basic Field Training Course at the FBI Academy in Quantico, Virginia where I received approximately 18 weeks of instruction in the fundamentals of law, ethics, behavioral science, interviewing, report writing, firearms, surveillance, defensive tactics, crime scene analysis, evidence collection, other investigative techniques, and case management.  Since the Academy, I have received additional FBI training regarding criminal and counterterrorism investigations, including training concerning the use of electronic communications and digital devices in furtherance of crimes.  As a federal agent, I am authorized to investigate violations of laws of the United States, and, as a law enforcement officer, I am authorized to execute warrants issued under the authority of the United States.

6.    Through the course of my training and employment with the FBI, I have used a variety of investigative techniques and resources, including the execution of search warrants and review of both physical and digital evidence collected through search warrants.  I am familiar with the strategy, tactics, methods, tradecraft, and techniques of criminals, terrorists, and their agents, as well as types of evidence and where that evidence is found for related criminal offenses.

7.    As a result of this experience and my conversations with other law enforcement personnel, including an FBI Special Agent Bomb Technician ("SABT"), I am also familiar with the methods used by individuals to commit those crimes specifically

using fire and explosives, what may be evidence of the same, where evidence of those crimes is stored or saved, as well as effective investigative methods to investigate them and uncover related crimes like arson or attempts to damage property.

### III. SUMMARY OF PROBABLE CAUSE

8.    On December 1, 2025, at approximately 8:20 a.m., Jose Francisco Jovel ("JOVEL") threw two items consistent with Molotov cocktails into the federal building located at 300 N. Los Angeles Street.  When JOVEL was interviewed, he admitted he had lit his apartment on fire before traveling to the federal building, which is consistent with law enforcement and fire department reports of responding to a fire at the address on JOVEL's identification card.

9.    In addition to the two suspected Molotov devices that JOVEL threw into the building, law enforcement recovered an additional five suspected Molotov devices from bags that JOVEL brought with him to the federal building.  Law enforcement also recovered a lighter and the SUBJECT DEVICES from JOVEL's belongings.

10.    According to JOVEL, he was motivated by his anger at the federal government over their immigration policies and actions.  After being detained, JOVEL also made clear he intended to attack federal officials.  For example, JOVEL stated "this is a terrorist attack anyways" and "I attacked your bitch ass and you didn't do nothing."

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

11.  According to my review of video surveillance, at approximately 8:00 a.m. an individual in a reflective work vest -- later identified as JOVEL -- arrived outside the front of the federal building at 300 N. Los Angeles Street in downtown Los Angeles, California.

12.  According to my review of the building's video surveillance, JOVEL arrived outside the federal building with multiple shopping bags.  Between approximately 8:00 a.m. and 8:20 a.m., JOVEL appears to be repeatedly yelling at and gesturing at Federal Protective Service officers[1] at the entrance.  According to FBI Special Agents that interviewed some of the people present, an officer reported that, among other things, JOVEL said if there weren't kids there, he would kill them (referring to the officers).

13.  At approximately 8:20 a.m., while standing at the base of the stairs outside the main entrance to the building, JOVEL reached into one of the bags on his bike handlebars and then threw an object through the sliding door (which was open at the time) that is marked as the employee entrance of the federal building.  Based on the video surveillance, I could see that this object appeared to be a mostly-clear closed container with something that may have been fabric coming out of the top.  As further described below, an FBI SABT observed the remnants of

---

[1] It is my understanding that security officers stationed at the front of the federal building are employed by Paragon Security Federal Protective Service.  I know Paragon is a company that provides security and officers across several government agencies and facilities.

the first item JOVEL threw into the federal building and noticed charring and/or evidence of burning, suggesting the device had been lit on fire before being thrown into the building.  Two screen captures from the video surveillance when JOVEL threw the first object and two photographs of the object that broke apart are depicted below.



14.  Right after throwing this first object, the surveillance video shows JOVEL turn and throw a second object that was in his left hand through the public entrance of the federal building (where members of the public were waiting to go through security to enter the building).  Like the first object

JOVEL threw, this object appeared to be approximately the same
size and also a mostly-clear closed container with something
that may have been fabric coming out of the top.  Based on my
review of two angles of video surveillance, I believe the fabric
coming out of the lid of this item may have been on fire when
JOVEL threw it into the federal building.  Two stills from the
video surveillance showing the object JOVEL threw and it landing
are depicted below.  The object is within the added blue
circles.





15.  After it was thrown, I observed, on the video, an officer pick up the container and then a piece of fabric which was so wet with the liquid that had been inside the container that it was dripping as he picked it up.

16.  Members of the Federal Protective Service immediately approached JOVEL.  Before they detained JOVEL, according to what an officer present told FBI Special Agents, JOVEL said he had explosives on him.  Officers detained JOVEL.  At the time, JOVEL had his California Department of Motor Vehicles identification card on him, which was issued on November 23, 2021, and listed an apartment on Westmoreland Avenue as JOVEL's address ("JOVEL's Apartment").  JOVEL also identified himself by his last name.

17.  Based on information I received from other law enforcement personnel, law enforcement searched JOVEL's belongings and found the following items:

    a.  a flame torch, which I know to be a handheld device that can be used to produce a flame -- it is sometimes used as a kitchen or grill tool;

    b.  two airsoft guns;

    c.  five knives or multitools that included knives;

    d.  the SUBJECT DEVICES[2] -- SUBJECT DEVICES 1 through 4 were found on JOVEL's person, in his jacket, while SUBJECT DEVICES 5 and 6 were amongst his belongings in his bags; and

---

[2] Based on my training and experience, each of the SUBJECT DEVICES appears to be a smart phone, meaning a phone that can use the Internet and other applications in addition to making/sending and receiving calls and messages.

e.   five additional suspected Molotov cocktails located inside JOVEL's shopping bags that appeared similar to those that were thrown into the federal building entrance.  I have seen a photograph of these objects and they are clear glass containers with a Nescafe logo and a lid.  Each one had translucent liquid inside of it and what appeared to be a piece of fabric sticking through the lid and sitting in the liquid inside.

18.  The below pictures show the other suspected Molotov cocktail devices (with wicks inserted) and the lighter/torch that JOVEL possessed at the federal building.

 



19.  An FBI SABT examined the five similar devices and
deconstructed them to make them safe.  According to the FBI SABT
each one was made of a breakable container and contained a wick
(the fabric that could be used to ignite).  Further according to
a test of samples of the liquids from some of these devices,
they contained hand sanitizer or ethanol.  According to the FBI
SABT, ethanol is a flammable liquid and accelerant.  According
to my training and experience, I also know that often because
the mixture of ingredients in hand sanitizer that hand sanitizer
is capable of igniting.

20.  Based on the above, in the opinion of the FBI SABT,
the above-described objects were similar to what is known as a
Molotov cocktail because they included a glass (breakable)
bottle, with a flammable liquid inside, and an ignition source
to ignite the liquid (fabric), thereby constituting a
destructive device pursuant to 26 U.S.C. § 5845(f).  Based on
the FBI SABT's training and experience, a Molotov cocktail is a
hand-thrown explosive or incendiary weapon.

21.  Further according to the FBI SABT, he observed the
remnants of the two devices thrown into the building.  The first
device -- thrown through the employee entrance -- broke into
pieces.  According to the FBI SABT, he saw a similar lid with a
piece of fabric going through the lid.  Specifically, according
to the FBI SABT, he noticed charring and/or evidence of burning
on some pieces of the glass container near the doorway where
part of the container landed.  In his opinion, this is evidence

that JOVEL lit it on fire before throwing it into the federal building.

22.   According to the FBI SABT's review of the second device thrown -- through the public entrance -- it was also a breakable glass container with a then separated piece or orange-red fabric that was completely saturated with a liquid that had a strong smell of alcohol.

### A.   JOVEL Described His Conduct as a "Terrorist Attack" and Said He was Motivated by the Government's Immigration Policy

23.   Based on an audio recording I received from the Federal Protective Service, I know that JOVEL made various statements to Federal Protective Service officers after he was detained, including "this is a terrorist attack anyways . . . you're separating families . . . ."  I recognize "separating families" as something commonly discussed by those that oppose current government immigration policies.  On the recording, I also heard JOVEL repeatedly say "murder that bitch ass."  He then yelled for people to "start shooting these," referring to the officers.  He also yelled "I attacked your bitch ass and you didn't do nothing."  I did not hear any officer ask him any questions between these statements.  After an officer asked him what was in the bottle, JOVEL said "different things," and then said something about lighting it on fire.  After discussing lighting it on fire, JOVEL said he wanted to "get" the people who "challenged" him and "separated families."  I also heard JOVEL repeatedly refer to the last seven months in connection with his actions on December 1, 2025.

24.   According to an FBI agent that spoke to JOVEL after he was detained by the Federal Protective Service, FBI agents advised JOVEL of his <u>Miranda</u> rights and JOVEL agreed to speak to the agents.  Among other things, in sum and substance, JOVEL told the agents the following:

a.   He lit his apartment on fire because he was frustrated with the apartment building management;

b.   He tried to light on fire one of the items he threw inside the federal building with the lighter he had on him, and he wasn't sure if it lit because he was rushing to get it inside the federal building; and

c.   He did this because he was mad at immigration policies and actions of the federal government.

25.   While JOVEL was detained by the Federal Protective Service, FBI agents arrested JOVEL.

**B.   Earlier in the Morning, JOVEL Lit his Apartment on Fire and Possessed Containers to Make Additional Molotov Cocktails**

26.   According to a Los Angeles Police Department ("LAPD") Detective Supervisor, at approximately 4:02 a.m. on December 1, 2025, the Los Angeles Fire Department ("LAFD") responded to JOVEL's Apartment for a "fully involved structure fire."  LAFD

successfully extinguished the fire, which had damaged the couch,
ceiling, and walls within JOVEL's Apartment, depicted below.



27.   According to what an LAPD Detective Supervisor told
the FBI, the LAFD Captain determined the fire was suspicious and
potentially arson based on his observations and training and
experience.

28.   Further according to what the LAPD Detective
Supervisor told the FBI, an LAFD arson investigator responded to
JOVEL's Apartment and determined an accelerant was used based on
a strong odor of gasoline that he could smell in the apartment
and a Bureau of Alcohol, Tobacco, Firearms, and Explosives K-9
alerted in a manner that indicates the K-9 detected an
accelerant.  Based on that, as well as the burn patterns
observed, he formed the opinion that JOVEL's Apartment had been
intentionally lit on fire.  As discussed above, JOVEL later
admitted he lit his apartment on fire when interviewed by the
FBI.

29.  According to the arson investigator, there was a Los Angeles County Sheriff's eviction notice posted at JOVEL's Apartment.  JOVEL was the listed renter on the notice.

30.  According to the LAPD Detective Supervisor, LAFD investigators interviewed JOVEL's neighbors who said they observed JOVEL running out the back of building at the time of the fire wearing a reflective vest.

31.  According to the LAPD Detective Supervisor, at approximately 9:56 a.m. on December 1, 2025, JOVEL's Apartment was released by LAFD and LAPD secured it until it was searched pursuant to federal search warrant.[3]

32.  According to FBI agents who conducted the search of JOVEL's apartment, they found the following items, among other things:

a.  Two Nescafe glass containers similar to some of the containers that JOVEL brought to the federal building, pictured to the right;



b.  Several cellular phones;

c.  Bottles of hand sanitizer;

d.  Two reflective vests that appear to be similar to the one JOVEL is wearing in the above video surveillance stills; and

e.  Mail addressed to JOVEL at that address.

---

[3] On December 1, 2025, the Honorable Patricia Donahue, United States Magistrate Judge, authorized a search of JOVEL's Apartment for evidence, fruits, and instrumentalities of the Subject Offenses.

**C.    JOVEL Has a Significant Criminal History that Includes Criminal Threats**

33.  I have reviewed JOVEL's criminal history records and he has been convicted of multiple felonies (crimes punishable by more than one year in prison), including at least the following:

a.    In 2018, JOVEL was convicted of Grand Theft, in violation of Cal. Penal Code § 487(A), and Criminal Threats, in violation of Cal. Penal Code § 422(A), for which his initial sentence included jail time and probation, which he repeatedly violated before it was terminated in 2021;

b.    In 2001, JOVEL was convicted of Vehicle Theft in violation of Cal. Veh. Code § 10851(A), and Dangerous Weapons, in violation of Cal. Penal Code § 12020(A)(1), for which he was sentenced to six years' and sixteen months' imprisonment, respectively;

c.    In 1993, JOVEL was convicted of two counts of Robbery in the First Degree, in violation of Cal. Penal Code § 211, for which he was sentenced to nine years' imprisonment; and

d.    In 1992, JOVEL was convicted of Robbery (no degree specified), in violation of Cal. Penal Code § 211, for which he was sentenced to three years' imprisonment.

34.  Additionally, according to the criminal history records I reviewed, JOVEL has two sustained juvenile petitions in 1988, one where the filed charge was Live Ammunition by a Minor, in violation of Cal. Penal Code § 12021.5(B), for which he was sentenced to two months' camp community placement; and

the other where the filed charge was Murder, in violation of
Cal. Penal Code § 187, for which he was sentenced to three
years' camp community placement.

**V. <u>TRAINING AND EXPERIENCE RELATED TO THE SUBJECT OFFENSES</u>**

35.  Based on my training and experience and the collective
experiences relayed to me by other law enforcement officers who
specialize in fire and explosive investigations, including their
manufacturing and use, I am aware of the following:

a.  Criminal subjects who engage in the unauthorized
possession or use of destructive devices or arson generally
maintain photographs of, receipts of, and communications about
their illegal activities in places that are readily accessible
and under their physical control, such as their digital devices
or in their residences.  They also may keep mementos of their
conduct, including digital photographs or recordings of
themselves possessing or creating destructive devices, or using
the same, on their digital devices.  These photographs and
recordings are often shared via social media, text messages, and
over text messaging applications.  Given the ubiquitous use of
digital devices by adults in this country it is often common for
an individual to have more than one digital device and for
various devices to have sometimes the same or different
photographs, communications, or other records on them.

b.  Individuals who engage in the unauthorized
production or possession of destructive devices (including
explosive or incendiary devices), or arson, often keep
contraband in places where they have ready access and control,

16

including digital devices they carry with them.    They also often store records or other information related to their destructive devices or their manufacture and subcomponents.

c.    These individuals often research and practice before manufacturing or using destructive devices, making it likely that evidence of practice or materials related to research and devices may be found amongst an individual's belongings or on their digital devices that they may have used to research or document practice.    An individual who possesses or uses one destructive device commonly also has information about or possesses other types of destructive devices, or other explosive items, or using fire.

d.    If these individuals are motivated by specific beliefs, including anti-law enforcement or anti-governments beliefs, it is not uncommon for evidence of those beliefs, including reading materials, posters, insignia, or other related items and representations of beliefs to be found on their digital devices in photograph, notes, or other forms, including evidence of searches done related to those beliefs.

36.    Further, it is common, based on my training and experience, that individuals motivated by specific beliefs to often communicate with others regarding those beliefs and their activities before and after conducting such activities.    This may include reaching out for assistance, in a variety of forms, before (including well in advance of any activity) and after the illegal activity.

## VI.   <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

37.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

38.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

 c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

 d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

39.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

 a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

40.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

        c.   The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress JOVEL's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of JOVEL's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

//

//

## VII.  **CONCLUSION**

41.  For all the reasons described above, there is probable cause to believe that JOVEL committed a violation of 18 U.S.C. § 844(f)(1): Attempted Malicious Damage of Federal Property. There is also probable cause the items listed to be seized in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT DEVICES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
December, 2025.

_____
HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE